# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JAKE ROWLEY, et al<br><br>Plaintiffs,<br><br>v.<br><br>DANIEL D. MCARTHUR, et al<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:13-cv-00959<br><br>District Judge Dee V. Benson |

This matter is before the Court on Defendants' Motion for Summary Judgment on Remaining Claim of Plaintiff Jake Rowley, filed on June 13, 2018. (Dkt. No. 105.) Plaintiff timely filed a memorandum in opposition to Defendants' Motion on August 8, 2018. (Dkt. No. 112.) Defendants filed a timely reply in response to Plaintiff's opposition on September 28, 2018. (Dkt. No 115.) Pursuant to civil rule 7-1(f) of the United States District Court for the District of Utah Rules of Practice, the Court elects to determine the motion on the basis of the written memoranda and finds that oral argument would not be helpful or necessary. DUCivR 7-1(f).

## **BACKGROUND**

Early in the morning of May 17, 2013, City of St. George code enforcement officer Malcom Turner drove by a rental house inhabited by Jake Rowley. (Dkt. No. 112 at 1-2.) Turner claims that as a result of that drive by, he observed potential municipal code violations on the property. Specifically, Turner reported that he first observed that the side-yard fence appeared to be in substantial disrepair. (Dkt. No. 105 at 5.) The fence was six feet high, upright, and enclosed the side-yard of the house which was fully attached to the backyard. (Dkt. No. 112

at 2, 5-6, 13; Dkt. No 105 at 8; *see also* Dkt. No. 106-5.)  Turner acknowledges that it is all one connected yard inside the fence.  (*See* Dkt. No. 112 at 5; Dkt. No. 115 at 8.)

The side-yard fence gate, located only 22 inches from Rowley's home, was ajar that morning.  (Dkt. No. 112 at 2, 7.)  Turner also claims that because the gate had been left open, any passerby could "view the junk and debris stored in the side-yard area from the street and front sidewalk" through the gate opening.  (Dkt. No. 105 at 19.)   Plaintiff disputes that assertion, claiming that "nothing" could be seen from the sidewalk or the street.  (Dkt. No. 112-2 ¶36.)

Turner walked across the front lawn to approach the gate to investigate further, entering Rowley's unenclosed "front of the east side-yard area of the house."  (Dkt. No. 112 at 22; Dkt. No. 105 at 12; Dkt. No. 115 at 7.)  During the full inspection of Rowley's property, Turner took 11 photographs of the alleged violations.  (Dkt. No. 112 at 15.)  No sidewalk or path led up to the gate entrance to the enclosed side-yard area at that time.  (*Id.* at 2, 14-15.)  Turner claims that he used a wide-angle lens camera to take pictures of inoperable unregistered vehicles, junk, trash, debris, and rubbish in the side-yard, a fence "unable to stand upright as designed without propping or additional support," with rotting fence posts on the inside of the fence, as well as other purported code violations.  (Dkt. No. 105 at 6-7.)  Defendants concede for purposes of this Motion that Turner opened the gate farther than it had been left open previously in order to take the pictures.  (Dkt. No. 115 at 17.)

Plaintiff claims that "there is no way" Turner could have taken those photographs unless the camera was placed beyond the inside edge of the fence, and thus that Turner "definitely shot the photograph of the inside of the fence from inside of the enclosed backyard."  (Dkt. No. 112 at 18.)  Turner concedes that he "was able to walk up to the fence and be a few inches taller than the fence" and that he stood on Rowley's property to take the photographs of his side-yard

2

"through his open gate." (Dkt. No. 105 at 12; *see also* Dkt No. 115 at 11.) Defendants claim that there "could be a dispute of fact," however, as to whether Turner ever actually physically entered the enclosed side-yard, since Turner testified that he "was never required to enter the side-yard to take the pictures." (Dkt. No. 105 at 11-12.)

Besides taking the enclosed side-yard photos, Turner also entered the top of the unenclosed 22.5-foot-long driveway. (Dkt. No. 112 at 14-15.) While there, Turner took a picture of the rear license plate on Rowley's truck indicating an expired registration. (Dkt. No. 105 at 5.) The license plate was on the back side of the truck facing toward the garage, with the rear of the truck about four feet from the house. (Dkt. No. 112 at 14.) According to Plaintiff, Turner "admitted that he had to pass through [Plaintiff's] stuff" to take a picture behind the truck, and would have been "standing amid Rowley's tools and the supplies that Rowley was storing" adjacent to Rowley's parked truck to take the photographs. (*Id.* at 25; Dkt. No. 105 at 15.) These items were "within a couple feet of Rowley's home," and included a used washing machine, his son's bicycle which was being repaired, electrical cords, weightlifting weights, and tools for his work as a tile setter and a woodworking project. (Dkt. No. 112 at 2, 14-15.) Although the truck and driveway were visible from the public street, Plaintiff alleges that the expired license plate was not visible to the public at the time of the alleged search. (*See* Dkt. No. 112 at 31.)

Later that day, Turner sent an Administrative Code Enforcement notice to the owners of the house; Rowley consequently faced threatened eviction if he did not remove or repair the offending violations. (Dkt. No. 4 at 4, 16, 20.) In response to this notice, around June 17, 2013 Rowley repaired his fence over a period of one to two days. (Dkt. No. 105 at 11; Dkt. No. 112 at

13.) His repairs left his side-yard completely unscreened and open to public visibility during those two days. (Dkt. No. 105 at 20.)

On the day of Turner's alleged search, Rowley lived in his rented home with his eight-year old son and nine-year old daughter. (Dkt. No. 112 at 13.) Rowley testifies that at that time, his children played in the backyard "on almost a daily basis," with a trampoline they used several times per week, bikes which his children would ride almost daily, his son's toy truck and red wagon, and a hot tub which he and his children would regularly bathe in. (*Id.* at 13-14.) He also asserts that he would have family gatherings and barbeques there, and kept the family dog there along with Rowley's valuable possessions like his boat, tools, and motorcycles. (*Id.*) Accordingly, he claims that the only people who accessed the side-yard gate to the backyard were Rowley and his children. (*Id.* at 15.)

Plaintiff further alleges that the top five feet of his driveway served as the house porch (as an extension of his garage) because there was no porch area near the front door. (*Id.* at 14.) He would typically park his truck on the lower portion of the driveway below the porch area so his kids could play basketball and "catch" on both the porch area and the front lawn on either side of the driveway. (*Id.*) On nice days, he would pull his exercise and wood working equipment out from the garage to use them in that "porch" area. (*Id.*)

## DISCUSSION

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." The U.S. Supreme Court has instructed that, at a minimum, courts applying Fourth Amendment jurisprudential protections "must assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." *United States v.*

4

*Jones*, 565 U.S. 400, 406 (2012). Therefore, "[i]n determining whether a search or seizure is unreasonable, we begin with history. We look to the statutes and common law of the founding era to determine the norms that the Fourth Amendment was meant to preserve." *Virginia v. Moore*, 553 U.S. 164, 168 (2008).

The Government's physical intrusion on constitutionally protected private property for the purpose of obtaining information undoubtedly "would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted." *United States v. Jones*, 565 U.S. 400, 404–05 (2012). The seminal common-law case for ascertaining the original public understanding of the Fourth Amendment's meaning is *Entick v. Carrington,* 95 Eng. Rep. 807 (C.P. 1765), which the Supreme Court has described as a "a monument of English freedom undoubtedly familiar to every American statesman at the time the Constitution was adopted, and considered to be the true and ultimate expression of constitutional law with regard to search and seizure." *Jones*, 565 U.S. at 405. In *Entick*, the court explained that property rights were intimately connected with its search-and-seizure analysis, stating in part:

> "[O]ur law holds the property of every man so sacred, that no man can set his foot upon his neighbour's close without his leave; if he does he is a trespasser, though he does no damage at all; if he will tread upon his neighbour's ground, he must justify it by law." *Entick,* 95 Eng. Rep. at 817.

*See also Jones*, 565 U.S. at 405. Relying heavily on this established tradition and supporting caselaw, the Supreme Court in *Jones* concluded that "[t]he text of the Fourth Amendment reflects its close connection to property, since otherwise it would have referred simply to 'the right of the people to be secure against unreasonable searches and seizures'; the phrase 'in their persons, houses, papers, and effects' would have been superfluous." *Id.* Accordingly, for much of the Supreme Court's history, its Fourth Amendment jurisprudence was based on the common-law trespass doctrine. *See Kyllo v. United States*, 533 U.S. 27, 31 (2001).

5

"[W]hen it comes to the Fourth Amendment, the home is first among equals." *Florida v. Jardines*, 569 U.S. 1, 6 (2013). Indeed, an individual's right "to retreat into his own home and there be free from unreasonable government intrusion" has always been at the "very core" of the Fourth Amendment. *See Silverman v. United States*, 365 U.S. 505, 511 (1961). Also clearly established at the time of the founding were the common law protections of what Blackstone identified as the "curtilage or homestall," where the "house protects and privileges *all* its branches and appurtenants." 4 W. Blackstone, Commentaries on the Laws of England 223, 225 (1769) (emphasis added). More specifically, curtilage has been defined as the area "immediately surrounding and associated with the home," and has historically been treated as part of the home itself under the Fourth Amendment. *Oliver v. United States*, 466 U.S. 170, 180 (1984). As with the distinction between open fields (not regarded as curtilage) and the home, the legal protections afforded to curtilage from unreasonable government intrusions are "as old as the common law." *See Jardines*, 569 U.S. at 6.

Once established that the government physically entered a constitutionally protected area, the remaining question is whether the government had an explicit or implicit license to be there. An implicit license exists where the property owner's actions establish an implied invitation for visitors to enter private property, based on local habits or customs. *See id.* at 7-8. Furthermore, "[t]he scope of a license—express or implied—is limited not only to a particular area but also to a particular purpose." *Id.* at 9. To illustrate, the Supreme Court in *Jardines* stated that "the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds . . . . This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Id.* at 8. Thus, while a

government agent may have an implied license to approach a home and knock on the door (as any private citizen may do) without a warrant, subsequently lingering on the property to search the curtilage would exceed the scope of the license.

The common-law trespass doctrine remains at least as robust today as it was in the founding era. While *Katz v. United States,* 389 U.S. 347 (1967) expanded the Fourth Amendment protections beyond what had previously been available through the "reasonable expectations" test, it did not in any way reduce or diminish the property-based protections that existed prior to that decision. "Katz did not erode the principle that when the Government does engage in physical intrusion of a constitutionally protected area in order to obtain information, that intrusion may constitute a violation of the Fourth Amendment." *Jones*, 565 U.S. at 407; *see also Alderman v. United States*, 394 U.S. 165, 180 (1960) ("[W]e [do not] believe that *Katz*, by holding that the Fourth Amendment protects persons and their private conversations, was intended to withdraw any of the protection which the Amendment extends to the home . . . .")

Therefore, if a Government actor trespasses onto constitutionally protected property without warrant or license, and for the purpose of obtaining information, it has committed a "search" in violation of the Fourth Amendment.

### I. Driveway Search

#### a. Fourth Amendment

The Supreme Court in *Jones* reaffirmed that the common-law trespassory test under the Fourth Amendment was not replaced by the reasonable-expectation-of-privacy test in *Katz*, but rather remains an important enduring alternative to it. *See Jones*, 565 U.S. at 407. The Court has also since reiterated that the area "immediately surrounding and associated with the home— what our cases call the curtilage—" is regarded "as part of the home itself for Fourth

Amendment purposes." *Jardines*, 569 U.S. at 6. This area surrounding the home is "intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened." *California v. Ciraolo*, 476 U.S. 207, 213 (1986).

Furthermore, "the ability visually to observe an area protected by the Fourth Amendment does not give officers the green light to physically intrude on it." *Collins v. Virginia*, 138 S. Ct. 1663, 1673 n.3 (2018). "While law enforcement officers need not shield their eyes when passing by the home on public thoroughfares, . . . an officer's leave to gather information is sharply circumscribed when he steps off those thoroughfares and enters the Fourth Amendment's protected areas." *Jardines*, 569 U.S. at 7.

Defendants argue that as in *Rieck v. Jensen*, 651 F.3d 1188 (10th Cir. 2011) and *Neff v. Thompson* (2014 WL 4851852 at *9 (D. Utah 2014) (unpublished), the *Dunn* factors[1] conclusively establish that a driveway falls outside the curtilage of a home. (Dkt. No. 105 at 21.) However, *Rieck* and *Neff* were decided prior to the Supreme Court's clarifying guidance in *Collins*. In *Collins*, the Court held that the top portion of a partially-enclosed driveway is curtilage entitled to Fourth Amendment protections from the Government's physical intrusions to gather information. This is true even though the driveway was not fully enclosed, because of its proximity and close connection to the home where "the activity of home life extends." *Collins v. Virginia*, 138 S. Ct. 1663, 1666-67 (2018). "Just like the front porch, side garden, or area outside the front window, . . . the driveway enclosure where [the officer] searched the motorcycle constitutes an area *adjacent to* the home and to which the activity of home life extends, and so is properly considered curtilage." *Id.* at 1671 (emphasis added).

---

[1] *United States v. Dunn*, 480 U.S. 294 (1987) held that "Curtilage questions should be resolved with particular reference to four factors": 1) the proximity of the area claimed to be curtilage to the home, 2) whether the area is included within an enclosure surrounding the home, 3) the nature of the uses to which the area is put, and 4) the steps taken by the resident to protect the area from observation by people passing by.

8

While Defendants attempt to distinguish *Collins* by arguing that Rowley's driveway was not curtilage because it was "entirely unenclosed," the Court's holding did not require driveways or garages to be enclosed to qualify as curtilage:

> "the privacy interests at stake in one's private residential property are far greater than on a public street. . . . [I]t is of no significance that the [vehicle] was parked just a short walk up the driveway. The driveway was private, not public, property, and the [vehicle] was parked in the portion of the driveway beyond where a neighbor would venture, in an area intimately linked to the home, . . . where privacy expectations are most heightened."
> *Id.* at 1673 n.3 (citations omitted).

Instead, the Court highlighted that "the ability visually to observe an area protected by the Fourth Amendment does not . . . permit an officer physically to intrude on curtilage . . . ." *Id.* Nor is the fact that Rowley's driveway was not structurally connected to his home (e.g., as with some partially-enclosed garages or driveways) dispositive. Holding otherwise would render the constitutional protection of property "immediately surrounding" homes both meaningless and superfluous. By definition, curtilage is not required to be structurally a part of the home.

While the top area of Rowley's driveway was unenclosed and visible from public sidewalk and streets, it was undoubtedly "intimately linked" to his home in both proximity and function. Rowley's house did not have a front porch area, so the top of his driveway essentially functioned as such. Turner's photographs were taken somewhere within just four feet of Rowley's house, between the rear of his truck and the garage. As an extension of his garage, Rowley used his "porch" area to work on his children's toys and repair his son's bicycle, conduct woodworking projects, and store his tools for his work as a tile setter. His children used it to play basketball and other sports, and Rowley would pull his exercise equipment out of the garage on nice days to work out in that space. (Dkt. No. 112 at 14.) While the Court need not resolve whether the *entire* driveway was sufficiently proximate or "intimately linked" to his home to

9

qualify as curtilage, the area between the truck and the garage where Turner took the license plate photo was clearly curtilage.

Thus, by physically occupying the "top" area of Rowley's private driveway 1) in close proximity to and "immediately surrounding" his home, 2) which was associated with the intimate activities of his home, 3) for the sole purpose of gathering information, and 4) without license or warrant, Turner engaged in an unlawful search in violation of the Fourth Amendment.

### b. Qualified Immunity on the Driveway Claim

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Panagoulakos v. Yazzie*, 741 F.3d 1126, 1129 (10th Cir. 2013). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that *every* reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011) (emphasis added). Thus, "[f]or the law to be 'clearly established,' there ordinarily must be a Supreme Court or Tenth Circuit opinion on point, or the clearly established weight of authority from other circuits must point in one direction," *Pompeo v. Bd. of Regents of the Univ. of N.M.*, 852 F.3d 973, 981 (10th Cir. 2017), placing the constitutional question "beyond debate." *Reichle v. Howards*, 566 U.S. 658, 664 (2012).

Defendants correctly contend that "whether the driveway area was in fact "curtilage" as clearly defined in 2013 is the principal point of debate between the parties . . . ." as it relates to qualified immunity. Although Plaintiff has shown that Turner violated his Fourth Amendment

10

right under *Jardines* and *Collins*, *Jardines* was decided less than two months before Turner's search took place, and *Collins* was decided over five years afterward. It cannot thus be said that it was "beyond debate" in 2013 that the top area of an unenclosed driveway qualifies as curtilage under these circumstances, and that Turner's intruding on that property to photograph the license place was a search. To illustrate this, Defendants persuasively cite Tenth Circuit and District of Utah precedent to show that there was a sufficiently open question that existed at the time of Turner's search regarding whether searching such a driveway violated the Fourth Amendment. *See, e.g., Rieck v. Jensen*, 15 651 F.3d 1188, 1193 (10th Cir. 2011) (concluding that "a driveway abutting and clearly visible from a public highway is not a suitable setting for intimate activities associated with a home."); *see also Neff v. Thompson*, 2014 WL 4851852 at *8 (D. Utah September 29, 2014) (unpublished) ("Specifically, the Tenth Circuit has held that 'a driveway abutting and clearly visible from a public highway is not a suitable setting for intimate activities associated with a home [and thus not within the curtilage of the home.]'"); *United States v. Echeverria*, 203 Fed.Appx. 936, 938 (10th Cir. 2006) (unpublished) (holding that curtilage "does not include an unobstructed driveway beside a house"); *United States v. Carter*, 360 F.3d 1235 (10th Cir. 2004) (concluding that "[t]he officers' initial conduct -- driving by the house two times, parking nearby, walking up the driveway, and shining their flashlights into a car in the driveway -- do not implicate the Fourth Amendment.").

Thus because Plaintiff has not sufficiently established that "every reasonable official would have understood" at the time of the challenged conduct that Turner's actions on the driveway violated the Fourth Amendment, and because existing precedent did not place that specific constitutional question "beyond debate," Plaintiff has not met his high burden of demonstrating that the law was "clearly established" in 2013. *Ashcroft*, 563 U.S. at 741.

11

Plaintiff has failed to overcome Turner's claim that he is entitled to qualified immunity on the driveway claim. Thus, specifically regarding Turner's search of Rowley's driveway, the Court grants Defendants' motion for summary judgment on qualified immunity grounds.

II. **"Side-Yard" Search**

   a. **Fourth Amendment**

The Supreme Court and Tenth Circuit have found that an enclosed backyard in close proximity to a home is curtilage. For instance, in *California v. Ciraolo*, the Supreme Court held that a suburban home's enclosed backyard was curtilage, observing that "[t]he claimed area . . . immediately adjacent to a suburban home, [and] surrounded by high double fences" was encompassed within the home's curtilage. *See* 476 U.S. at 213. Additionally, the Tenth Circuit held that entry into both the defendant's backyard and then into his garage was a violation of the Fourth Amendment as the backyard and garage were curtilage, and there were no exigent circumstances to justify the entry. *United States v. Carter*, 360 F.3d 1235, 1241-42 (10th Cir. 2004); see also *Lundstrom v. Romero*, 616 F.3d 1108, 1128-29 (10th Cir. 2010) (holding that there was "little trouble finding Lundstrom's backyard qualified as curtilage"). The Tenth Circuit also found that whether a backyard gate is open or closed is immaterial; a detective's "passing through an open gate in a fence that enclosed the backyard" was held to be entering the defendant's curtilage. *See United States v. Chavez*, 561 F. App'x 730, 731,732 (10th Cir. 2014) (unpublished).

Plaintiff has demonstrated that his side-yard was indistinguishable from his backyard in the enclosed portion, and was "intimately linked to [his] home both physically and psychologically" and thus entitled to the most heightened privacy expectations under the Fourth Amendment. Even more than the top of his driveway, Rowley's side-yard was an area

"immediately surrounding and associated with the home" and thus regarded "as part of the home itself." Defendants have failed to rebut Plaintiff's claim that his enclosed side-yard and backyard activities were intimately linked to his home. To the contrary, Plaintiff has plausibly alleged that 1) his children and their friends played back there on almost a daily basis, 2) he stored his valuables there, 3) he would have friends and family over for barbeques there, and 4) he and his children would regularly bathe there in the hot tub. (Dkt. No. 112 at 22.) Additionally, his front side-yard area near the gate "immediately surrounded" his home, and was used as an extension of his family activities like "playing catch" with his son there. (*Id.* at 14.) No implied license existed to trespass on that private front lawn area, as there is "no path and no sidewalk" across that lawn, and "the only people who access[ed] that gate into the backyard [were] Rowley and his children." (*Id.* at 15, 24.) In that sense, that unenclosed side-yard lawn was more akin to what the Court referred to as a constitutionally protected "side garden" than to an "open field." See *Collins*, 138 S. Ct. at 1671.

A factual issue remains regarding whether Turner physically entered through the side-yard gate to take those pictures. However, this fact is unnecessary to show that Turner violated the Fourth Amendment. Under the common-law trespass approach, Defendants' entry on to Rowley's private front yard area for the purpose of searching Rowley's curtilage in tandem with his subsequent inspection and photography of Rowley's enclosed side-yard was sufficient to violate the Fourth Amendment.

Defendants rely heavily on the *Dunn* factors to argue that Rowley's side-yard was not curtilage. They also argue that "what a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection," *Katz v. United States,* 389 U.S. 347, 351 (1967), and that by knowingly exposing his side-yard to public view Rowley

13

forfeited his Fourth Amendment protections. The first three *Dunn* factors in Rowley's case, however, weigh strongly in favor of the side-yard being curtilage. While the fourth *Dunn* factor (*i.e.*, steps taken by the resident to protect the area from public observation) is a closer call, Defendants have not met their burden of showing that Plaintiff forfeited his Fourth Amendment rights by simply leaving the gate door slightly ajar or by having a decaying fence. Rather, Plaintiff has convincingly demonstrated that the fence remained sufficiently propped up to completely enclose the backyard at the time of the search, and that a slightly open gate did not materially lessen the effectiveness of that enclosure.

Nor did Rowley forfeit his rights by subsequently repairing the fence in response to Defendants' threat of criminal action, thereby exposing his side-yard to public view for between one to two days. As an equitable matter, the City of St. George can't both require Rowley to repair his fence and then subsequently claim that his property lost its curtilage protections because he complied with its orders.

Defendants may also argue that Turner had a right to enter the front side-yard area (*i.e.*, stopping short of the gate) for inspection since the area was completely unenclosed and thus "knowingly exposed" to public view. However, Defendants have not alleged that the violations Turner saw from public thoroughfares were located in the openly-visible front lawn area. Had the violations been both 1) clearly visible from the public street or sidewalk and 2) in an area that was knowingly exposed to public view, Turner could have then entered that area to investigate further. However, the evidence of the rotting fence and other municipal code violations was only located in the enclosed side-yard, which was an area that every reasonable official would have known was not intentionally exposed to public view.

Further, after *Jardines* the failure to fully enclose protected property appears to no longer be a highly relevant consideration under the Fourth Amendment's common-law trespass analysis. This Court thus declines to hold that anytime Rowley simply failed to ensure that his backyard gate was closed, he opened his property up to government trespass for purposes of gathering additional information on his curtilage. To set such a precedent would mean, for example, that anytime an individual accidentally leaves her front blinds open in the home she forfeits her Fourth Amendment protections against government officials approaching her home and photographing evidence they can see inside the house from a closer vantage point. While taking photographs of curtilage from a public vantage point may be lawful, trespassing on private property to get a better view of it is a step too far.

Thus, by trespassing a considerable distance onto Rowley's front lawn for the sole purpose of gathering information without license or warrant, and by approaching closer to the gate to photograph Rowley's enclosed side-yard which was clearly 1) in close proximity to and "immediately surrounding" his home, 2) associated with the intimate activities of his home, and 3) indistinguishable from his backyard, Turner conducted an unlawful search of curtilage in violation of the Fourth Amendment.

### b. Qualified Immunity on the Side-Yard Claim

Viewing the facts in the light most favorable to the non-moving party (here the Plaintiff), the Court assumes for purposes of this Motion that the photographed code violations were not visible from the sidewalk or street, that Turner opened the gate further, and that he entered the enclosed side-yard area through the gate to take the photos.

In 2012, *Jones* reaffirmed the Fourth Amendment's common-law trespassory test. While *Katz* had held that "property rights [were] not the sole measure of Fourth Amendment

15

violations," the *Jones* Court clarified *Katz* did not narrow the Fourth Amendment's scope by "snuf[fing] out the previously recognized protection for property." Thus, "when the Government does engage in physical intrusion of a constitutionally protected area [such as a backyard] in order to obtain information, that intrusion may constitute a violation of the Fourth Amendment." *Jones*, 565 U.S. at 404-08. Accordingly, *Jones* undermines Defendants' claimed qualified immunity on the side-yard claim as it was well-established precedent at the time of the 2013 search. *See id.* Although the common-law trespass doctrine clearly does not protect against government intrusions on open fields, Defendants have failed to refute Plaintiff's well-founded contention that every reasonable official would have understood after *Jones* that trespassing on Rowley's side-yard to gather information was an unlawful search of curtilage.

In support of their claimed qualified immunity, Defendants argue that at the time of the search the Tenth Circuit in had already determined that a "side-yard" area of a home was not curtilage. *See United States v. Cousins*, 455 F.3d 1116 (10th Cir. 2006). However, that case is easily distinguishable. In *Cousins*, the side-yard was only partially enclosed on three sides and had a paved sidewalk leading up to it; the owner took no steps to limit public access to the side-yard, demonstrating that it was not intended to be a private space for gardening as the owner had claimed. *Id.* at 1112-23. By contrast, in this case Rowley's side-yard was completely enclosed like a backyard (except for a gate that was left slightly ajar), and there was no sidewalk or path leading to it for public access. The only way for Turner to get to the gate to take pictures was to encroach on private property without license; the photographed area was clearly intended to be a private space. Thus, *Cousins* is insufficient to grant summary judgment for qualified immunity.

Regardless of the *Dunn* factors' application, Turner was separately on notice from *Jones* that if he trespassed on constitutionally protected property under without warrant or license to

16

obtain additional information, he was conducting an unlawful search.  Plaintiff's actions were insufficient to constitute knowing and open exposure of his side-yard to public view.  Furthermore, as highlighted above, existing precedent at the time of the search clearly established that suburban backyards were curtilage.  Therefore, with regard to Defendants' motion for summary judgment, Plaintiff has met his burden of alleging facts sufficient to overcome Defendants' qualified immunity claim on the side-yard search as a matter of law.  The Court thus denies Defendants' motion for summary judgment regarding qualified immunity for Turner's side-yard search.

### III. Administrative Searches

Defendants also argue that because Turner's search happened "in an administrative context," and was thus "less of an intrusion on personal privacy and dignity than that which generally occurs in the course of criminal investigation" that Turner's administrative search was not sufficiently intrusive to violate the Fourth Amendment.  (Dkt. No. 105 at 24-25; *see Widgren v. Maple Grove Township*, 429 F.3d 575, 584 (6th Cir.2005).)

While true that "a routine inspection of the physical conditions of private property is a less hostile intrusion than the typical policeman's search for the fruits and instrumentalities of crime," the Supreme Court has long held that the Fourth Amendment nevertheless protects against warrantless and unreasonable administrative searches of personal residences, not just criminal searches.  *Camara v. Mun. Ct. of S.F.*, 387 U.S. 523 (1967); *see also See v. City of Seattle*, 387 U.S. 541, 542 (1967) ("In *Camara*, we held that the Fourth Amendment bars prosecution of a person who has refused to permit a warrantless code-enforcement inspection of his personal residence."); *cf. Michigan v. Tyler*, 436 US 499 (1978).  The Court does not therefore find the administrative nature of Turner's search to be dispositive on Defendants'

motion for summary judgment regarding either the Fourth Amendment or qualified immunity grounds.

## **CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment is PARTIALLY GRANTED regarding qualified immunity on Plaintiff's driveway search claim, and PARTIALLY DENIED regarding qualified immunity on Plaintiff's side-yard search claim.

DATED this 21st day of December, 2018.

BY THE COURT

U.S. District Judge Dee Benson